**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **L.S., M.P., A.G., M.W., S.C., and T.W.**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>V.<br><br>**JOHNSON & JOHNSON, JANSSEN PHARMACEUTICALS, INC.**, and **INTRA-CELLULAR THERAPIES, INC.**,<br><br>Defendants. | Case No. 1:25-cv-18012<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs L.S., M.P., A.G., M.W., S.C., and T.W. (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendants Johnson & Johnson ("J&J"), Janssen Pharmaceuticals, Inc. ("Janssen") and Intra-Celluar Technologies, Inc. ("ICT", and together with J&J and Janssen, "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Information concerning an individual's health is among the most sensitive, and closely guarded information in our society.

2. The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are

unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

3. J&J is one of the largest healthcare companies in the world. J&J employs 138,000 employees through its 275+ subsidiaries and manufactures thousands of well-known pharmaceuticals and medical devices including under household name brands like Band-Aid, Aveeno, Reach, Splenda, and Zyrtec.[1] Janssen and ICT are both wholly owned subsidiaries of J&J.

4. The manufacture and sale of pharmaceuticals is a key component of J&J's business, generating over $50 billion in sales for J&J in 2024.[2] As part of its pharmaceutical business, J&J and its subsidiaries maintain consumer-directed marketing websites for their various pharmaceutical products, including the following medications prescribed to Plaintiffs:

| **Brand Name** | **Pharmaceutical** | **Manufacturing J&J Subsidiary** | **Website** |
|---|---|---|---|
| Xarelto | rivaroxaban | Janssen | www.xarelto-us.com (the "Xarelto Website") |
| Caplyta | lumateperone | Janssen | www.caplyta.com (the "Caplyta Website") |
| Topamax | topiramate | Janssen | www.topamax.com (the "Topamax Website") |
| Simponi | golimumab | Janssen | www.simponi.com (the "Simpon Website") |
| Tremfya | guselkumab | ICT | www.tremfya.com (the "Tremfya Website") |
| Remicade | infliximab | Janssen | www.remicade.com (the "Remicade Website") |

Defendants also maintain similar websites for numerous other pharmaceuticals, including: Akeega, Balversa, Carvykti, Concerta, Darzalex, Edurant, Elmiron, Erleada, Imaavy, Imbruvica, Intelence,

---

[1] *Our Company*, JOHNSON & JOHNSON, www.jnj.com/our-company (last accessed Oct. 22, 2025); *Johnson & Johnson*, INST. HEALTH & PROD. STUDIES—JOHN HOPKINS UNIVERSITY (2015), *available online at*: https://publichealth.jhu.edu/sites/default/files/2023-06/jnj.pdf (last accessed Oct. 22, 2025).
[2] *2024 Annual Report*, JOHNSON & JOHNSON, *available online at*: https://www.jnj.com/corporate-reports last accessed Oct. 22, 2025).

Invega, Invokamet, Ivokana, Lazcluze, Opsumit, Opsynvi, Prezcobix, Prezista, Procrit, Resperdal, Rybrevant, Sirturo, Spravato, Stelara, Symtuza, Talvey, Tecvayli, Tracleer, Uptravi, Veletri, Ventavis, Yondelis, Zavesca, and Zytiga. Hereinafter, these consumer-directed pharmaceutical marketing websites are referred to collectively as the "Pharmaceutical Websites".

5. Through the Pharmaceutical Websites, patients can obtain information about Defendants' pharmaceutical products, apply for and receive vouchers for discounts on Defendants' pharmaceuticals ("Saving Cards"), and register for the Pharmaceutical Websites' Patient Portals and support programs.[3] After registration, patients are offered additional medical support relating to their prescriptions, including access to registered nurses who server as "Nurse Guides" for Defendants' patients, prescription cost support programs, and various medical informational resources offered exclusively through the Patient Portals.[4] Each of the Plaintiffs used a Pharmaceutical Website for some or all of these purposes, as described more fully below.

6. Unfortunately, unbeknownst to Plaintiffs and other visitors to the Pharmaceutical Websites, Defendants do not keep their patients' private personal and health information confidential. Instead, through the Pharmaceutical Websites, Defendants collected and transmitted personally identifiable and sensitive health information pertaining to Plaintiffs' medical conditions, prescriptions and medical expenses (collectively, the "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google") Meta Platforms, Inc. ("Facebook"), Microsoft Corp. ("Microsoft"), and ByteDance, Inc. ("TikTok", and together with Google, Facebook and Microsoft, the "Tracking Tool Providers"), through the use of surreptitious online tracking tools without Plaintiffs' or Class Members' consent.

---

[3] *See* Pharmaceutical Websites, at ¶ 4, *supra*.
[4] *Id*.

7. Online advertising giants like the Tracking Tool Providers compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person. If, for example, the Tracking Tool Providers receive information that a person is suffering from arthritis, they can use that information, and allow their clients to use that information, to deliver ads to that person's computers and smartphones for products and services related to arthritic pain management.

8. The Tracking Tool Providers offer website operators access to their proprietary suites of marketing, advertising, and customer analytics services, including Google's *Google Analytics*, *Google AdSense*, and *Google Tag Manager* products; Facebook's *Meta Business Suite* and *Facebook Ads* products; Microsoft's *Microsoft Advertising*, *Big Ads*, and *Xandr* products; and TikTok's *TikTok Pixel* product (collectively, the "Business Tools"). By using any of the Tracking Tool Providers' Business Tools, website operators can leverage the Tracking Tool Providers' enormous databases of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments to exploit.

9. The Tracking Tool Providers' massive databases of consumer information can only exist with the help of users of the Business Tools, like Defendants. To use any one of the Tracking Tool Providers' Business Tools, a website operator must install the Tracking Tool Providers' internet user surveillance software onto their website, including tracking pixels ("Pixels") and cookies (collectively, the "Tracking Tools"). In other words, if a website operator wishes to use, e.g., Google Analytics, it must install Google's Tracking Tools onto its website. After being

installed, the Tracking Tools capture detailed information about every visitor to the website, which may include the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer. Moreover, this sensitive information often includes a unique identifier that the Tracking Tool Providers use to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information

10. In essence, when website operators use the Tracking Tool Providers' Business Tools, they choose to participate in the Tracking Tool Providers' mass surveillance network and, in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their customers' privacy.

11. Defendants are companies that choose to prioritize their marketing efforts and profits over their patients' privacy by installing the Tracking Tools on their websites. Each of the Plaintiffs and Class Members used a Pharmaceutical Website and had their personal Sensitive Health Information tracked by Defendants using the Tracking Tools. However, Defendants ***never*** obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties. Therefore, at all relevant times, Plaintiffs and Class Members could not, and did not, provide informed consent for their Sensitive Health Information to be transmitted to the third parties, including to the largest advertisers and compilers of personal information in the world.

12. Numerous commentators have raised alarm at these practices. A full decade ago, in 2015, Politico published a report exposing how drug companies like Defendants collect consumer medical data through price discount programs without their knowledge, sometimes even collecting

the entirety of a patient's medical records.[5] As scrutiny of such practices increased, the FTC took action in a similar case against GoodRX Holdings, Inc. due to its practice of collecting medical data on-line from customers of its prescription drug discount program.[6] Yet, despite over a decade of public outcry, Defendants continue to collect and disclose the Sensitive Health Information of users of the Pharmaceutical Websites to unauthorized third parties.

13. Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[7] Accordingly, Defendants' disclosure of Plaintiffs' and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

14. As a result of Defendants' conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

---

[5] *See* Darius Tahir, *Big Pharma gets data for discounts*, POLITICO (Dec. 22, 2015), https://www.politico.com/story/2015/12/drug-companies-data-for-discounts-217080 (last accessed Oct. 23, 2025).

[6] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising*, FEDERAL TRADE COMMISSION (Feb 1, 2024), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising (last accessed Oct. 23, 2025).

[7] 18 U.S.C. § 1320d-(6).

15. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*; violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1, *et seq.*; and violations of the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*

## II. PARTIES

***Plaintiff L.S.***

16. Plaintiff L.S. is a citizen of the State of New Jersey, residing in Atlantic County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

17. Plaintiff L.S. suffers from Factor V Leiden, a medical condition which significantly increases her risk of suffering a life-threatening deep vein thrombosis ("DVT") or pulmonary embolism. To treat this condition, Plaintiff L.S.'s physician prescribed Xarelto, a medication produced, marketed and sold by Defendants.

18. In or around May of 2025, Plaintiff L.S. visited the Xarelto Website to obtain information regarding Xarelto, register for an account, and apply for a Savings Card.

19. Unbeknownst to Plaintiff L.S., the Xarelto Website transmitted her Sensitive Health Information—including the fact that she was registering for a Johnson & Johnson patient account in connection with her Xarelto prescription, the fact that she enrolled in the Xarelto savings program and her specific medical condition—to unauthorized third parties through the Tracking Tools.

20. Plaintiff L.S. never authorized Defendants to disclose any aspect of her communications with Defendants through the Xarelto Website to third parties, including the Sensitive Health Information that she provided through the Xarelto Website.

21. On every occasion that she visited the Xarelto Website, Plaintiff L.S. possessed an account with Google, and she accessed the Xarelto Website while logged into her Google account on the same device.

22. After providing her Sensitive Health Information to Defendants through the Xarelto Website, Plaintiff L.S. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Plaintiff M.P.***

23. Plaintiff M.P. is a citizen of the State of Michigan, residing in Macomb County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

24. Plaintiff M.P. suffers from Bipolar Disorder ("BPD"), a challenging mental health condition that is unfortunately highly stigmatized by society. To treat this condition, Plaintiff M.P.'s doctor prescribed her Caplyta, a medication produced, marketed and sold by Defendants.

25. In or around September of 2025, Plaintiff M.P. visited the Caplyta Website to obtain information regarding Caplyta, and apply for a Savings Card.

26. Unbeknownst to Plaintiff M.P., the Caplyta Website transmitted her Sensitive Health Information—including the fact that she was prescribed Caplyta, had applied for and downloaded a Caplyta Savings Card and her specific medical condition—to unauthorized third parties through the Tracking Tools.

27. Plaintiff M.P. never authorized Defendants to disclose any aspect of her communications with Defendants through the Caplyta Website to third parties, including the Sensitive Health Information that she provided through the Caplyta Website.

28. On every occasion that she visited the Caplyta Website, Plaintiff M.P. possessed accounts with Google and Microsoft, and she accessed the Caplyta Website while logged into her Google and Microsoft accounts on the same device.

29. After providing her Sensitive Health Information to Defendants through the Website, Plaintiff M.P. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Plaintiff A.G.***

30. Plaintiff A.G. is a citizen of the State of Illinois, residing in Madison County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

31. Plaintiff A.G. suffers from obesity, a challenging medical condition that is unfortunately highly stigmatized by society. To treat this condition, Plaintiff A.G.'s doctor prescribed her Topamax, an epilepsy medication produced, marketed and sold by Defendants that is commonly prescribed to significantly overweight patients for its weight-loss effects.

32. In or around March of 2024, Plaintiff A.G. visited the Topamax Website to obtain information regarding Topamax, register for an account, and apply for a Savings Card.

33. Unbeknownst to Plaintiff A.G., the Topamax Website transmitted her Sensitive Health Information, including the fact that she is prescribed Topamax and downloaded a Topamax Savings Card, to unauthorized third parties through the Tracking Tools.

34. Plaintiff A.G. never authorized Defendants to disclose any aspect of her communications with Defendants through the Topamax Website to third parties, including the Sensitive Health Information that she provided through the Topamax Website.

35. On every occasion that she visited the Topamax Website, Plaintiff A.G. possessed an account with Google, and she accessed the Topamax Website while logged into her Google account on the same device.

36. After providing her Sensitive Health Information to Defendants through the Topamax Website, Plaintiff A.G. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Plaintiff M.W.***

37. Plaintiff M.W. is a citizen of the State of Indiana, residing in Orange County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

38. Plaintiff M.W. suffers from Rheumatoid Arthritis, a painful, mobility-limiting health condition that often worsens rapidly without active treatment. To treat this condition, Plaintiff M.W.'s doctor prescribed her Simponi, a medication produced, marketed and sold by Defendants.

39. In or around January of 2025, Plaintiff M.W. visited the Simponi Website to obtain information regarding Simponi, register for an account, and apply for a Savings Card.

40. Unbeknownst to Plaintiff M.W., the Simponi Website transmitted her Sensitive Health Information, including the fact that she is prescribed Simponi, the specific medical information she accessed, and her specific medical condition, to unauthorized third parties through the Tracking Tools.

41. Plaintiff M.W. never authorized Defendants to disclose any aspect of her communications with Defendants through the Simponi Website to third parties, including the Sensitive Health Information that she provided through the Simponi Website.

42. On every occasion that she visited the Simponi Website, Plaintiff M.W. possessed an account with Google, and she accessed the Simponi Website while logged into her Google account on the same device.

43. After providing her Sensitive Health Information to Defendants through the Website, Plaintiff M.W. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Plaintiff S.C.***

44. Plaintiff S.C. is a citizen of the State of Arkansas, residing in Sebastian County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

45. Plaintiff S.C. suffers from psoriasis, an uncomfortable and often embarrassing skin condition. To treat this condition, Plaintiff S.C.'s doctor prescribed her Tremfya, a medication produced, marketed and sold by Defendants.

46. In or around September of 2025, Plaintiff S.C. visited the Tremfya Website to obtain information regarding Tremfya, register for an account, and apply for a Savings Card.

47. Unbeknownst to Plaintiff S.C., the Tremfya Website transmitted her Sensitive Health Information, including the fact that she is prescribed Tremfya, the fact that she registered for a Tremfya patient account, the fact that she requested a Tremfya Savings Card, and her specific medical condition, to unauthorized third parties.

48. Plaintiff S.C. never authorized Defendants to disclose any aspect of her communications with Defendants through the Tremfya Website to third parties, including the Sensitive Health Information that she provided through the Tremfya Website.

49. On every occasion that she visited the Tremfya Website, Plaintiff S.C. possessed accounts with Google and TikTok, and she accessed the Tremfya Website while logged into her Google and TikTok accounts on the same device.

50. After providing her Sensitive Health Information to Defendants through the Tremfya Website, Plaintiff S.C. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Plaintiff T.W.***

51. Plaintiff T.W. is a citizen of the State of New Jersey, residing in Camden County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

52. Plaintiff T.W. suffers from severe ulcerative colitis, an uncomfortable and often embarrassing medical condition that causes her severe pain and fatigue. To treat this condition, Plaintiff T.W.'s doctor prescribed her Remicade, a medication produced, marketed and sold by Defendants.

53. In or around September of 2025, Plaintiff T.W. visited the Remicade Website to obtain information regarding Remicade, register for an account, and apply for a Savings Card.

54. Unbeknownst to Plaintiff T.W., the Remicade Website transmitted her Sensitive Health Information, including the fact that she is prescribed Remicade, the fact that she registered for a Remicade patient account, and the fact that she requested a Remicade Savings Card.

55. Plaintiff T.W. never authorized Defendants to disclose any aspect of her communications with Defendants through the Remicade Website to third parties, including the Sensitive Health Information that she provided through the Remicade Website.

56. On every occasion that she visited the Remicade Website, Plaintiff T.W. possessed an account with Google and she accessed the Website while logged into her Google account on the same device.

57. After providing her Sensitive Health Information to Defendants through the Website, Plaintiff T.W. immediately began seeing targeted online advertisements for products and services related to her medical condition.

***Defendant J&J***

58. Johnson & Johnson is a for-profit corporation incorporated in the State of New Jersey, with its principal place of business located at One Johnson and Johnson Plaza, New Brunswick, NJ, in Middlesex County.

***Defendant Janssen***

59. Janssen Pharmaceuticals, Inc. is a for-profit corporation incorporated in the State of New Jersey, with its principal place of business located at 1125 Trenton Harbourton Road, Titusville, NJ, in Middlesex County.

***Defendant ICT***

60. Intra-Cellular Therapies, Inc. is a for-profit corporation incorporated in the State of New Jersey, with its principal place of business located at 135 Route 202/206, Suite 6, Bedminster, NJ, in Somerset County.

## III. JURISDICTION AND VENUE

61. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of

$5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendants. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

62. This Court has personal jurisdiction over Defendants because they are headquartered in this judicial district, and have otherwise made or established contacts in the State of New Jersey and in this judicial district sufficient to permit the exercise of personal jurisdiction.

63. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. DEFENDANTS' USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i. The Tracking Tool Providers Mass Advertising Surveillance Operations

64. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[8] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[9]

65. Google advertises Google Analytics and other Business Tools to website operators, like Defendants, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[10] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[11]

66. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[12]

---

[8] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

[9] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Oct. 23, 2025).

[10] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Oct. 23, 2025).

[11] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Oct. 23, 2025).

[12] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Oct. 23, 2025).

67. Google also admits that it uses the information collected from third party websites, such as Defendants', to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[13]

68. Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117 billion, roughly 97% of which was derived from the sale of digital advertisements.[14]

69. Facebook markets its Business Tools to website operators, claiming that that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[15]

70. But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendants, and uses that information to sell targeted advertising.[16] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[17]

---

[13] *Id.*

[14] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last accessed Oct. 23, 2025).

[15] *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last accessed Oct. 23, 2025).

[16] *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last accessed Oct. 23, 2025).

[17] *Id.*

71. Microsoft is the largest software company in the world, offering a diverse portfolio of product offerings including the Windows operating system, Office 365 software suite, LinkedIn professional social networking site, Xbox video gaming platform, as well as numerous targeted advertising products.[18] In 2024, Microsoft generated over $77-billion in revenue, including $12-billion derived from its advertising products.[19]

72. Microsoft markets its Business Tools to website operators, claiming that that its Business Tools can "consolidate user behavior and uncover[] trends, so we can make your website better together for retail, content publishers, small business owners, and everywhere in between."[20]

73. But, website operators using Microsoft's Business Tools must install Microsoft's Tracking Tools on their website. Microsoft readily admits that it:

> generates a unique advertising ID for each person using a device, which app developers and advertising networks can then use for their own purposes, including providing relevant advertising in apps…Microsoft apps and third-party apps can access and use the advertising ID in much the same way that websites can access and use a unique identifier stored in a cookie. Thus, your advertising ID can be used by app developers and advertising networks to provide more relevant advertising and other personalized experiences across their apps and on the web.[21]

74. TikTok is a social media company that allows users to share and watch short-term video content, subscribe to other TikTok users, and find videos and content creators relevant to

---

[18] *Annual Report 2024*, MICROSOFT (Oct. 18, 2024), *available online at*: www.microsoft.com/investor/reports/ar24/.
[19] *Id.*
[20] *Clarity*, MICROSOFT, https://clarity.microsoft.com/ (last visited Aug. 1, 2025)
[21] *Microsoft Privacy Statement*, MICROSOFT, https://www.microsoft.com/en-us/privacy/privacystatement#mainadvertisingidmodule (last visited Aug. 1, 2025).

their interests. While TikTok is a newer entrant to the online advertising industry, it has grown rapidly, with its global ad revenue estimated to surpass $32-billion this year.[22]

75. TikTok admits that it will "match" the information collected through its Tracking Tools with "corresponding accounts on TikTok inventory to create a subset of matched IDs …and combine those Matched IDs with corresponding" data collected from other website operators and through its products.[23]

76. While the Tracking Tool Providers admit that they collect information from third-party websites through the Tracking Tools, neither provides, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of the Tracking Tool Providers' data collection practices referenced above could not have given Plaintiffs and Class Members any reason to think that Defendants were part of the Tracking Tool Providers' surveillance networks. Moreover, as Defendants do not disclose their use of the Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of the Tracking Tool Providers privacy statements in connection with their use of the Pharmaceutical Websites

77. The Tracking Tool Providers aggregate the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected about a given user.[24] With these advertising profiles, the Tracking Tool Providers can sell hyper-

---

[22] *Platform Insights: TikTok 2025*, WARC (Mar. 4, 2025), *available online at*: https://www.warc.com/content/paywall/article/Warc-Data/Platform_Insights_TikTok_2025/en-GB/159437?.

[23] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), *available online at*: https://ads.tiktok.com/i18n/official/policy/business-products-terms.

[24] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[25]

78. The surveillance of individual's internet usage through Tracking Tools is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google[, and] Facebook[.]"[26] Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[27]

79. Moreover, as in this case, the data collected through the Tracking Tools often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google and Facebook, to collect their user's browsing habits.[28] In fact, Google advertising trackers were found on 73-percent of pornography websites.[29]

---

[25] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics ((last accessed Oct. 23, 2025); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ ((last accessed Oct. 23, 2025); *About Ad Targeting in TikTok Ads Manager*, TIKTOK, https://ads.tiktok.com/help/article/ad-targeting?lang=en (last accessed Oct. 23, 2025).

[26] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

[27] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last accessed Oct. 23, 2025).

[28] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[29] *Id.*

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[30]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[31] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google and Facebook.[32]

d. Thirty-three of the most popular crisis center websites provide information to Facebook through its Meta Pixel, including, in some cases, that users filled out a contact form or clicked a button to initiate a call to a suicide helpline.[33]

80. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[34] Likewise, in 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by

---

[30] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[31] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Oct. 23, 2025).

[32] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Oct. 23, 2025).

[33] Colin Lechner & Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook (last accessed Oct. 23, 2025).

[34] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Oct. 23, 2025).

individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[35]

81. In fact, the Tracking Tool Providers value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[36]

82. When website operators, like Defendants, make use of the Tracking Tool Providers' Business Tools, they are essentially choosing to participate in the Tracking Tool Providers' mass surveillance network, and in return they benefit from the Tracking Tool Providers' collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[37] Likewise, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[38] TikTok's advertising platform similarly allows website operators to retarget prior visitors, measure

---

[35] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last accessed Oct. 23, 2025).

[36] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ ((last accessed Oct. 23, 2025) ("Google Analytics gives you the tools, free of charge"); *Meta Business Suite FAQ*, META, https://www.facebook.com/business/tools/meta-business-suite/help (last accessed Oct. 23, 2025) ("Meta Business Suite is a free tool"); *Get started with the TikTok Pixel*, TIKTOK (Sep. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last accessed Oct. 23, 2025) ("Bonus: it's free"); *Clarity*, Microsoft, https://clarity.microsoft.com/ (last accessed Aug. 1, 2025) ("Enjoy all the features of Clarity at absolutely zero cost. You'll never run into traffic limits or be forced to upgrade to a paid version").

[37] *Retargeting*, META, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last accessed Oct. 23, 2025).

[38] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Oct. 23, 2025).

their ad performance, and analyze their website audience if the website operator installs the TikTok Pixel.[39] And, Microsoft allows website operators to target customers using "custom data about users" that Microsoft collects from its other clients.[40]

83. In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[41] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[42]

84. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[43]

### ii. Pixels Can Record Almost Every Interaction Between a User and a Website

85. In order to use the Tracking Tool Providers' Business Tools, Defendants installed the Tracking Tools, including tracking Pixels, onto the Pharmaceutical Websites.

86. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…

---

[39] *Get started with the TikTok Pixel*, TIKTOK (Sep. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last accessed Oct. 23, 2025).

[40] *Key-Value Targeting*, MICROSOFT, https://learn.microsoft.com/en-us/xandr/invest/key-value-targeting (last visited Aug. 1, 2025).

[41] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[42] *Id.*

[43] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[44]

87. Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[45]

88. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[46]

**iii. The Pixels Installed on the Pharmaceutical Websites Transmit Personally Identifiable Information to the Tracking Tool Providers.**

89. Every website is hosted by a computer "server" that holds the website's contents.

---

[44] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Oct. 23, 2025).

[45] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting ((last accessed Oct. 23, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Oct. 23, 2025).

[46] *Lurking Beneath the Surface, supra* note 44.

90. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

91. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

92. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[47] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[48] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[49]

---

[47] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last accessed Oct. 23, 2025).

[48] *Id.*

[49] *Id.*

93. When a Tracking Tool Provider accountholder logs onto their account, their web browser records a tracking cookie.[50] These cookies include a specific line of code that links the web browser to the user's account with the Tracking Tool Provider.[51]

94. The Tracking Tool Providers' Pixels use cookies, but operate differently than cookies. Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

95. Simultaneously, the Pixels, like those installed on the Pharmaceutical Websites, request identifying information from any of the Tracking Tool Provider' cookies previously installed on the user's web browser.

96. The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to the Tracking Tool Providers. As a result, the Tracking Tool Providers can link all of the user information collected by their Pixels on the Pharmaceutical Websites to the user's identity, via the user's account or profile. Thus, even if a user never actually logs into a website, or fills out a form, the website, along with the Tracking Tool Providers, can know the user's identity.

97. A remarkable number of Americans possess a Google, TikTok, Microsoft or Facebook account. According to a 2023 survey, 68-percent of Americans report that they are users

---

[50] Cyphers, *supra* note 24.

[51] *Id.*

of Facebook.[52] One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client.[53] Approximately 230 million Americans use Microsoft's Windows operating system,[54] and 230-million Americans are members of Microsoft's LinkedIn social network.[55] And, approximately one-third of Americans report using TikTok.[56] When these users visit a website, like the Pharmaceutical Websites, that utilizes the Tracking Tool Providers' Tracking Tools, any information collected by the Pixels can be linked to the user's identity through the relevant cookies installed on the user's web browser.

98. However, it is not only accountholders of the Tracking Tool Providers that are at risk of having Pixel-collected website data linked to their identities. Rather, the Tracking Tool Providers utilize sophisticated data tracking methods to identify even those few users who do not have a account.

99. The Tracking Tools, like those on the Pharmaceutical Websites, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

---

[52] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last accessed Oct. 23, 2025).

[53] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 23, 2025); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Oct. 23, 2025).

[54] Medhi Rizvi, *How Many People Use Windows Worldwide*, TECH SEARCHERS (Apr. 15, 2025), How Many People Use Windows Worldwide - Tech Searchers (last visited Oct. 17, 2025).

[55] Naveen Kumar, *How Many People Use LinkedIn In 2025*, DEMANDSAGE (May 14, 2025), https://www.demandsage.com/linkedin-statistics/ (last accessed Oct. 23, 2025).

[56] Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Oct. 23, 2025).

100. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[57] By tracking this browser fingerprint, the Tracking Tool Providers are able to compile a user's activity across the internet.[58] And, as the Tracking Tool Providers continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**iv. Defendants Disclosed Plaintiffs' and Class Members' Sensitive Health Information to Unauthorized Third Parties.**

101. To register for patient accounts, download pharmaceutical Savings Cards, and receive information about their prescribed drugs, Plaintiffs and Class Members were required to use the Pharmaceutical Websites.

102. Unbeknownst to Plaintiffs and Class Members, Defendants intentionally configured the Tracking Tools installed on the Pharmaceutical Websites to capture and transmit the Sensitive Health Information that they communicated to Defendants while registering for patient accounts, accessing medical information, and applying for or accessing prescription Saving Cards to unauthorized third parties, including the Tracking Tool Providers. The information provided in the following Figures is exemplar information collected on the Pharmaceutical Websites, and are not Plaintiffs' information, but the Tracking Tools installed on the Pharmaceutical Websites collected the same or similar information about Plaintiffs and Class Members.

***Xarelto Website***

[57] Cyphers, *supra* note 24.

[58] *Id*.

103. The following screenshots ("Figures 1-2") depict network transmissions made to Google by the Tracking Tools installed on the Xarelto Website. As Figures 1-2 show, when patients register for an account and request a Savings Card through the Xarelto Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Xarelto Website includes the fact that the patient is prescribed Xarelto, the fact that the patient enrolled in the Xarelto patient savings program, the fact that the patient registered for a Xarelto patient account, and the patients' specific medical condition.

**▼ Query String Parameters** View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-336758H06E |
| gtm | 45je58q2v869611288z877881531za200zb77881531zd77881531 |
| _p | 1756333789694 |
| gcs | G101 |
| gcd | 13m3n3m3m5l1 |
| npa | 1 |
| dma_cps | - |
| dma | 0 |
| tag_exp | 101509157~103103158~103103160~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105427542~105427544 |
| gdid | dYWJhMj |
| cid | 490110183.1756315494 |
| ul | en-us |
| are | 1 |
| frm | 0 |
| pscdl | denied |
| _eu | AAAAAAQ |
| _geo | 1 |
| _rdi | 1 |
| _s | 2 |
| sid | 1756333791 |
| sct | 1 |
| seg | 0 |
| dl | https://www.account1.jnjwithme.com/user/register?flow=express&product=Xarelto |
| dr | https://www.xarelto-us.com/ |
| dt | Register |
| en | I_am_Patient_Express |
| ep.Component_ancestry | Register Page |
| ep.Flow_type | Patient Express |
| ep.Link_domain | www.account1.jnjwithme.com |
| ep.Link_text | Patient |
| ep.Page_title | Register |
| ep.Region_ancestry | America/Los_Angeles |
| _et | 147 |
| up.User_id | |
| up.User_type | |
| up.User_login_state | Guest user |
| tfd | 16128 |

| Query String Parameters | View source View URL-encoded |
|---|---|
| v | 2 |
| tid | G-336758H06E |
| gtm | 45je5al0v869611288z877881531za200zb77881531zd77881531 |
| _p | 1761163070273 |
| gcs | G101 |
| gcd | 13m3n3m3m5l1 |
| npa | 1 |
| dma_cps | - |
| dma | 0 |
| gdid | dYWJhMj |
| cid | 1814394239.1761163004 |
| ul | en-us |
| are | 1 |
| frm | 0 |
| pscdl | denied |
| _eu | AAAAAAQ |
| _geo | 1 |
| _rdi | 1 |
| _s | 2 |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528501~104684208~104684211~104948813~115480709~115938466~115938469~116110425~116110427~116130039 |
| sid | 1761163004 |
| sct | 1 |
| seg | 1 |
| dl | https://www.account1.jnjwithme.com/patient/xarelto/savings/enroll?condition=Nonvalvular%20Atrial%20Fibrillation&Language=English&OtherValue=undefined&utm_source=null |
| dr | https://www.account1.jnjwithme.com/user/register?flow=express&product=Xarelto |
| dt | Savings Enrollment |
| en | Eligibility_Questions-Express |
| ep.Component_ancestry | Patient Guided Flow |
| ep.Flow_type | Patient Express |
| ep.Link_domain | www.account1.jnjwithme.com |
| ep.Medication_Selected | Xarelto |
| ep.Page_title | Savings Enrollment |
| ep.Region_ancestry | America/New_York |
| ep.Navigation_ancestry | Eligibility Questions |
| _et | 11829 |
| up.User_id | |
| _et | 11829 |
| up.User_id | |
| up.User_type | |
| up.User_login_state | Guest user |
| tfd | 177261 |

*Figures 1-2. Exemplar screenshots depicting back-end network traffic from the Xarelto Website which shows information transmitted to Google when patients register for an account and enroll in the savings program.*

104. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff L.S. and Class Members to their identities. The following screenshots show that the Google Tracking Tools on the Xarelto Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's region and language.

105. Additionally, Tracking Tools produced by Microsoft, Facebook, TikTok, Twitter, Optimizely, and Medianet are also present on the Xarelto Website.

***Caplyta Website***

106. The following screenshots ("Figures 3-5") depict network transmissions made to Google and Microsoft by the Tracking Tools installed on the Caplyta Website. As Figures 3-5 show, when patients request and download a Savings Card through the Caplyta Website, the Sensitive Health Information requested and contemporaneously transmitted to Google and Microsoft by the Tracking Tools installed on the Caplyta Website includes the fact that the patient is prescribed Caplyta, the fact that the patient downloaded a Caplyta Savings Card, and the patients' specific medical condition.

▾ Query String Parameters View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-9F07KW7Q56 |
| gtm | 45je5ah1h2v9100163790z8813174404za200zb8813174404zd8813174404 |
| _p | 1760982214045 |
| gcs | G111 |
| gcd | 13r3r3r3r5l1 |
| npa | 0 |
| dma | 0 |
| gdid | dYWlhMj |
| cid | 372761043.1760982130 |
| ul | en-us |
| sr | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _geo | 1 |
| _rdi | 1 |
| _s | 8 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~115480709~115938465~1159 30460~116110425~116110427 |
| sid | 1760982129 |
| sct | 1 |
| seg | 1 |
| dl | https://www.caplyta.com/bipolar/savings-offer |
| dr | https://www.bing.com/ |
| dt | Saving on CAPLYTA® (lumateperone) |
| en | Co-pay Card Download |
| _c | 1 |
| up.Event_Action | Click |
| ep.Event Label | https://www.caplyta.com/savings-card.pdf |
| _et | 2 |
| tfd | 10735 |

| | |
|---|---|
| v | 2 |
| tid | G-KIT7SWQMRG |
| gtm | 45je5ah1h2v890401768z8813174404za200zb813174404zd813174404 |
| _p | 1760982214045 |
| gcs | G111 |
| gcd | 13r3r3r3r5l1 |
| npa | 0 |
| dma | 0 |
| gdid | dYWIhMj |
| cid | 372761043.1760982130 |
| ul | en-us |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _geo | 1 |
| _rdi | 1 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528501~104684208~104684211~104948813~105322303~115480709~115616986~115938465~115938460~116110422~116110424 |
| sid | 1760982129 |
| sct | 1 |
| seg | 1 |
| dl | https://www.caplyta.com/bipolar/savings-offer |
| dr | https://www.bing.com/ |
| dt | Saving on CAPLYTA® (lumateperone) |
| _s | 2 |
| tfd | 13409 |

▼ **Request Payload**

en=Co-Pay%20Checkbox&ep.Event_Action=Checked&ep.Event_Label=%2Fsavings-card.pdf&_et=3541
en=Co-Pay%20Checkbox&ep.Event_Action=Unchecked&ep.Event_Label=%2Fsavings-card.pdf&_et=778
en=Co-Pay%20Checkbox&ep.Event_Action=Checked&ep.Event_Label=%2Fsavings-card.pdf&_et=430
en=Download&ep.Event_Action=%2Fbipolar%2Fsavings-offer&ep.Event_Label=https%3A%2F%2Fwww.caplyta.com%2Fsavings-card.pdf&_et=1890
en=Content%20CTA&ep.Event_Action=%2Fbipolar%2Fsavings-offer&ep.Event_Label=Download%20my%20Savings%20Card&_et=1




*Figures 3-5. Exemplar screenshots depicting back-end network traffic from the Caplyta Website which shows information transmitted to Google and Microsoft when patients request and download a Savings Card.*

107. Further, the information that was transmitted to Google and Microsoft was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff M.P. and Class Members to their identities. The following screenshots show that the Google Tracking Tools on the Caplyta Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account; that the Microsoft Tracking Tools on the Caplyta Website transmitted the identifier numbers attached to Microsoft's 'mid' cookie, which identifies the user's Microsoft account; and that both Tracking Tools additionally transmitted information commonly used to make a browser fingerprint, including the user's device information and language.

108. Additionally, Tracking Tools produced by Amazon, Shopify, and Facebook are also present on the Caplyta Website.

***Topamax Website***

109. The following screenshot ("Figure 6") depicts network transmissions made to Google by the Tracking Tools installed on the Topamax Website. As Figure 6 shows, when patients request a Savings Card through the Topamax Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Topamax Website includes the fact that the patient is prescribed Topamax, and the fact that the patient downloaded a Topamax Savings Card.



▼ Query String Parameters View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-F2Q6BYLDFB |
| gtm | 45je58q2v892991060z8835478385za200zb835478385zd835478385 |
| _p | 1756332736210 |
| gcs | G111 |
| gcd | 13n3n3n3n5l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105427542~105427544 |
| gdid | dYWJhMj |
| cid | 256025028.1756332668 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3BA%3DBrand;99.0.0.0\|Microsoft%20Edge;139.0.3405.102\|Chromium;139.0.7258.128 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 2 |
| sid | 1756332668 |
| sct | 1 |
| seg | 1 |
| dl | https://www.topamax.com/coupon.html |
| dr | https://www.topamax.com/coupon.html |
| dt | Eligible Patients Can Pay $4 \| TOPAMAX® (topiramate) Savings Program |
| en | click |
| ep.link_classes | active |
| ep.link_id | |
| ep.link_text | SAVINGS CARD |
| ep.link_url | https://www.topamax.com/coupon.html |
| ep.outbound | false |
| ep.protocol | https: |

*Figure 6. Exemplar screenshot depicting back-end network traffic from the Topamax Website which shows information transmitted to Google when patients download a Savings Card.*

110. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff A.G. and Class Members to their identities. The following screenshots show that the Google Tracking Tools on the Topamax Website transmitted the identifier numbers attached to Google's 'cid' and 'gdid'

cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

111. Additionally, Tracking Tools produced by Amazon and Microsoft are also present on the Topamax Website.

***Simponi Website***

112. The following screenshots ("Figures 7-8") depict network transmissions made to Google by the Tracking Tools installed on the Simponi Website. As Figures 7-8 show, when patients view information about Simponi and apply for a Simponi Savings Card on the Simponi Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Simponi Website includes the fact that the patient is prescribed Simponi, the specific medical information that the patient accessed (here, that the patient watched an instructional video showing how to perform a Simponi self-injection), and the patient's specific medical condition.

Headers | Payload | Preview | Response | Initiator | Timing

**▼ Query String Parameters** View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-TCGXYJFGTS |
| gtm | 45je58q2v893497846z8835478385za200zb835478385zd835478385 |
| _p | 1756331211359 |
| gcs | G111 |
| gcd | 13n3n3n3n5l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528501~104684208~104684211~104948813~105427542~105427544 |
| gdid | dYWJhMj |
| ul | en |
| cid | 1739256843.1756331213 |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3BA%3DBrand;99.0.0.0\|Microsoft%20Edge;139.0.3405.102\|Chromium;139.0.7258.128 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 3 |
| dl | https://www.simponi.com/ |
| dr | |
| dt | SIMPONI® (golimumab) Treatment® |
| sid | 1756331212 |
| sct | 1 |
| seg | 1 |
| en | click |
| _c | 1 |
| ep.site_brand | simponi |
| ep.site_country | us |
| ep.site_region | NA |
| ep.site_audience | patient |
| ep.page_view_count | 1 |
| ep.debug_mode | false |
| ep.hostname | www.simponi.com |
| ep.link_classes | dropdown-item |
| ep.link_id | |
| ep.link_text | Rheumatoid Arthritis |
| ep.link_url | https://www.simponi.com/rheumatoid-arthritis |
| ep.outbound | false |
| ep.protocol | https: |
| ep.component_ancestry | |

**Query String Parameters** View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-TCGXYJFGTS |
| gtm | 45je5al0v893497846z8835478385za200zb835478385zd835478385 |
| _p | 1761167789759 |
| gcs | G111 |
| gcd | 13n3n3n3n5l1 |
| npa | 0 |
| dma | 0 |
| gdid | dYWJhMj |
| cid | 1756911652.1761167761 |
| ul | en-us |
| sr | 1920x1080 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;141.0.7390.108\|Not%3FA_Brand;8.0.0.0\|Chromium;141.0.7390.108 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 8 |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528501~104684208~104684211~104948813~115480710~115616986~115938466~115938468~116110425~116110427~116130039 |
| sid | 1761167760 |
| sct | 1 |
| seg | 1 |
| dl | https://www.simponi.com/rheumatoid-arthritis/what-is-simponi/ |
| dr | https://www.simponi.com/rheumatoid-arthritis/biologics/ |
| dt | What is SIMPONI® (golimumab) |
| en | video_start |
| _c | 1 |
| epn.video_current_time | 0 |
| dl | https://www.simponi.com/rheumatoid-arthritis/what-is-simponi/ |
| dr | https://www.simponi.com/rheumatoid-arthritis/biologics/ |
| dt | What is SIMPONI® (golimumab) |
| en | video_start |
| _c | 1 |
| epn.video_current_time | 0 |
| ep.video_duration | NaN |
| ep.video_percent | NaN |
| ep.video_provider | brightcove |
| ep.video_title | cp-358425v1 SIMPONI SJAI 50mg Injection Video |
| ep.video_url | blob:https://www.simponi.com/39154224-4d06-4590-8668-1d8d4b2b900d |
| ep.visible | true |
| ep.video_start_count | 1 |
| _et | 3949 |
| tfd | 16240 |

▾ Query String Parameters   View source   View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-RQR56HWZGL |
| gtm | 45je5al1v893003992z8835478385za200zb835478385zd835478385 |
| _p | 1761167843881 |
| gcs | G101 |
| gcd | 13m3n3m3m5l1 |
| npa | 1 |
| dma_cps | - |
| dma | 0 |
| gdid | dYWJhMj |
| cid | 1814394239.1761163004 |
| ul | en-us |
| sr | 1920x1080 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;141.0.7390.108\|Not%3FA_Brand;8.0.0.0\|Chromium;141.0.7390.108 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | denied |
| _eu | AAAAAAQ |
| _s | 3 |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528501~104684208~104684211~104948813~115480710~115616985~115938466~115938468~116110425~116110427 |
| sid | 1761167846 |
| sct | 1 |
| seg | 1 |
| dl | https://www.jnjwithme.com/patient/simponi/cost-support/ |
| dr | https://www.simponi.com/ |
| dt | Paying for SIMPONI® - Cost Support \| J&J withMe |
| en | click |
| ep.link_classes | |
| ep.link_id | |
| ep.link_text | Express Enrollment* |
| ep.link_url | https://account.jnjwithme.com/ |
| ep.outbound | false |
| ep.protocol | https: |
| ep.click_count | 1 |
| _et | 12 |
| tfd | 26648 |

*Figures 7-8. Exemplar screenshots depicting back-end network traffic from the Simponi Website which shows information transmitted to Google when patients request a Savings Card and access medical information.*

113. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff M.W. and Class Members to their identities. The following screenshots show that the Google Tracking Tools on the Simponi Website transmitted the identifier numbers attached to Google's 'cid' and 'gdid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

114. Additionally, Tracking Tools produced by Facebook, Microsoft, TikTok and Twitter are also present on the Simponi Website.

***Tremfya Website***

115. The following screenshots ("Figures 9-14") depict network transmissions made to Google and TikTok by the Tracking Tools installed on the Tremfya Website. As Figures 9-14 show, when patients apply for a Tremfya Savings Card and register for a patient account on the Tremfya Website, the Sensitive Health Information requested and contemporaneously transmitted to Google and TikTok by the Tracking Tools installed on the Tremfya Website includes the fact that the patient is prescribed Tremfya, the fact that the patient registered for a patient account, the fact that the patient requested a Savings Card, and the patient's specific medical condition.



▾ **Query String Parameters** View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-TCGXYJFGTS |
| gtm | 45je58q2v893497846z8835478385za200zb835478385zd835478385 |
| _p | 1756333082474 |
| gcs | G111 |
| gcd | 13n3n3n3n5l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103103158~103103160~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105347236~105427542~105427544 |
| gdid | dYWJhMj |
| cid | 448793481.1756333084 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3BA%3DBrand;99.0.0.0\|Microsoft%20Edge;139.0.3405.102\|Chromium;139.0.7258.128 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 5 |
| sid | 1756333084 |
| sct | 1 |
| seg | 1 |
| dl | https://www.tremfya.com/ |
| dr | https://www.jnj.com/ |
| dt | Official Consumer Website for TREMFYA® (guselkumab) |
| _tu | KA |
| en | click |
| _c | 1 |
| ep.link_classes | bg-dark-teal mb-4 d-flex flex-column justify-content-center ps-3 text-decoration-none text-white fs-22 fs-xl-25 fw-bold z-1 |
| ep.link_id | |
| ep.link_text | Moderately to severely active Crohn's disease |
| ep.link_url | https://www.tremfya.com/crohns-disease/ |
| ep.outbound | false |
| ep.protocol | https: |
| ep.component_ancestry | |
| ep.navigation_ancestry | |
| ep.region_ancestry | |
| ep.identifier | |
| ep.category | |
| ep.category2 | |


Headers
Payload
Preview
Response
Initiator
Timing
Cookies
Query String Parameters
View source
View decoded
v 2
tid G-336758H06E
gtm 45je5al1v869611288z877881531za200zb77881531zd77881531
_p 1761169324472
gcs G101
gcd 13m3n3m3m5l1
npa 1
dma_cps -
dma 0
gdid dYWJhMj
cid 1814394239.1761163004
ul en-us
are 1
frm 0
pscdl denied
_eu AAAAAAQ
_geo 1
_rdi 1
tag_exp 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~115480709~115616986~115938465~115938469~116110425~116110427
sid 1761169325
sct 2
seg 1
dl https%3A%2F%2Fwww.account1.jnjwithme.com%2Ftremfya-withme%2Faccount%2Fsign-up
dr https%3A%2F%2Fwww.tremfya.com%2F
dt TremfyaWithMe.com
_s 4
tfd 29497
Request Payload
en=element_click&ep.step_name=Personalized%20Support&ep.person=patient&ep.prescription_status=currently%20prescribed%20TREMFYA%C2%AE&ep.condition=Moderately%20to%20Severely%20Active%20Crohn's%20Disease&ep.pathway=I%20want%20it%20all&epn.step_number=1&ep.brand=Tremfya&ep.field_name=supportMail&_et=5115
en=element_click&ep.step_name=Personalized%20Support&ep.person=patient&ep.prescription_status=currently%20prescribed%20TREMFYA%C2%AE&ep.condition=Moderately%20to%20Severely%20Active%20Crohn's%20Disease&ep.pathway=I%20want%20it%20all&epn.step_number=1&ep.brand=Tremfya&ep.field_name=janssenProducts&_et=520
en=custom_form_field_click&ep.form_name=Digital%20Enrollment%20Form&ep.step_name=Personalized%20Support&epn.step_number=1&ep.brand=Tremfya&ep.person=patient&ep.prescription_status=currently%20prescribed%20TREMFYA%C2%AE&ep.condition=Moderately%20to%20Severely%20Active%20Crohn's%20Disease&ep.pathway=I%20want%20it%20all&ep.field_name=firstName&epn.custom_timestamp=1761169349582&_et=857
en=custom_form_field_click&ep.form_name=Digital%20Enrollment%20Form&ep.step_name=Personalized%20Support&epn.step_number=1&ep.brand=Tremfya&ep.person=patient&ep.prescription_status=currently%20prescribed%20TREMFYA%C2%AE&ep.condition=Moderately%20to%20Severely%20Active%20Crohn's%20Disease&ep.pathway=I%20want%20it%20all&ep.field_name=lastName&epn.custom_timestamp=1761169351058&_et=1469
en=custom_form_field_click&ep.form_name=Digital%20Enrollment%20Form&ep.step_name=Personalized%20Support&epn.step_number=1&ep.brand=Tremfya&ep.person=patient&ep.prescription_status=currently%20prescribed%20TREMFYA%C2%AE&ep.condition=Moderately%20to%20Severely%20Active%20Crohn's%20Disease&ep.pathway=I%20want%20it%20all&ep.field_name=email&epn.custom_timestamp=1761169351072&_et=12
en=custom_form_field_click&ep.form_name=Digital%20Enrollment%20Form&ep.step_name=Personalized%20Support&epn.step_number=1&ep.brand=Tremfya&ep.person=patient&ep.prescription_status=currently%20prescribed%20TREMFYA%C2%AE&ep.condition=Moderately%20to%20Severely%20Active%20Crohn's%20Disease&ep.pathway=I%20want%20it%20all&ep.field_name=firstName&epn.custom_timestamp=1761169351088&_et=12





*Figures 9-14. Exemplar screenshots depicting back-end network traffic from the Tremfya Website which shows information transmitted to Google and TikTok when patients request a Savings Card and register for an account.*

116. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff S.C. and Class Members to their identities. The following screenshots show that the Google Tracking Tools on the Tremfya Website transmitted the identifier numbers attached to Google's 'cid' and 'gdid' cookies, which identify the user's Google account; that the TikTok Tracking Tools on the Website transmitted the identifier numbers attached to TikTok's (deceptively named) 'anonymous id' cookie, which identifies the user's TikTok account; and that both Tracking Tools additionally transmitted information commonly used to make a browser fingerprint, including the user's device information and language.

117. Additionally, Tracking Tools produced by Facebook, Microsoft, and Amazon are also present on the Tremfya Website.

***Remicade Website***

118. The following screenshots ("Figure 15-16") depicts network transmissions made to Google by the Tracking Tools installed on the Remicade Website. As Figures 15-16 show, when patients request a Savings Card and register for an account through the Remicade Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Remicade Website includes the fact that the patient is prescribed Remicade, the fact that the patient registered for an account, and the fact that the patient requested a Remicade Savings Card.

Headers Payload Preview Response Initiator Timing

▼ Query String Parameters View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-TCGXYJFGTS |
| gtm | 45je58q0v893497846z88354783 85za200zb8354783 85zd8354783 85 |
| _p | 1756327667399 |
| gcs | G111 |
| gcd | 13n3n3n3n5l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103103158~103103160~103116026~103200004~103233427~104527907~104528500~104684208~104684211~104948813~105427542~105427544 |
| gdid | dYWJhMj |
| cid | 535158745.1756327658 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3BA%3DBrand;99.0.0.0\|Microsoft%20Edge;139.0.3405.102\|Chromium;139.0.7258.128 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 3 |
| sid | 1756327657 |
| sct | 1 |
| seg | 1 |
| dl | https://www.remicade.com/cost-support.html |
| dr | https://www.remicade.com/ |
| dt | REMICADE® (infliximab) Cost Support & More \| REMICADE® |
| en | click |
| _c | 1 |
| ep.link_classes | button arrow marginB0 |
| ep.link_id | |
| ep.link_text | LEARN MORE |
| ep.link_url | https://www.janssencarepath.com/patient/remicade/cost-support/ |
| ep.outbound | true |
| ep.protocol | https: |
| ep.component_ancestry | |
| ep.navigation_ancestry | |
| ep.region_ancestry | |
| ep.identifier | |
| ep.category | |
| ep.category2 | |
| ep.category3 | |




*Figures 15-16. Exemplar screenshots depicting back-end network traffic from the Remicade Website which shows information transmitted to Google when request a Savings Card and register for an account.*

119. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff T.W. and Class Members to their identities. The following screenshots show that the Google Tracking Tools on the Remicade Website transmitted the identifier numbers attached to Google's 'cid' and 'gdid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

120. Additionally, Tracking Tools produced by Facebook, Amazon and Microsoft are also present on the Remicade Website.

121. In their default state, the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage. Defendants purposely configured the Tracking Tools on the Pharmaceutical Websites to collect and transmit additional user data, including the specific actions

that Plaintiffs and Class Members' took while registering for accounts and applying for Savings Cards, their medical diagnoses, and their prescription statuses.

## B. DEFENDANTS DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

### i. Defendants failed to inform Plaintiffs and Class Members of its disclosure of Plaintiffs' and Class Members' Sensitive Health Information.

122. Defendants ***never*** informed Plaintiffs or Class Members that it was sharing their personally identifiable Sensitive Health Information with third parties, including the Tracking Tool Providers

123. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendants breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

124. Despite never telling users like Plaintiffs and Class Members, Defendants allowed third parties such as the Tracking Tool Providers to intercept Plaintiffs' and Class Members' Sensitive Health Information and use it for advertising purposes.

### ii. The Tracking Tools Used by Defendants Were Imperceptible to Plaintiffs and Class Members

125. The Tracking Tools installed on the Pharmaceutical Websites were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Pharmaceutical Websites through examination of its source code or the use of sophisticated web developer tools, there was no way for a Pharmaceutical Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on the Pharmaceutical Websites.

126. Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

127. Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

128. Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Pharmaceutical Websites, or that their Sensitive Health Information would be collected and transmitted to the Tracking Tool Providers, they could not and did not consent to Defendants' conduct.

### C. DEFENDANTS WERE ENRICHED BY THEIR DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES

129. Defendants Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information.

130. As explained, *supra*, users of the Business Tools, like Defendants, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tool Providers' Tracking Tools on their website.

131. Upon information and belief, Defendants, as users of the Tracking Tool Providers' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing the Tracking Tool Providers' to collect Plaintiffs' and Class Members' Sensitive Health Information.

#### i. Plaintiffs' and Class Members' Data Had Financial Value

132. Moreover, Plaintiffs' and Class Members' Sensitive Health Information has value and Defendants' disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

133. According to Facebook's annual report, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[59]

134. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

135. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[60] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[61]

136. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

137. The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

---

[59] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

[60] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[61] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

## D. DEFENDANTS' USE OF THE TRACKING TOOLS VIOLATES HIPAA

### i. The HIPAA Privacy Rule

138. The disclosure of Plaintiffs' and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[62]

139. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by covered entities.

140. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google, TikTok, Microsoft, or Facebook account) to identify a single individual.[63]

### ii. Defendants' Collected IIHI from Plaintiffs' and Class Members' and Transmitted it to Unauthorized Third Parties

141. The Sensitive Health Information that Defendants disclosed to unauthorized third-parties through the Tracking Tools—including the drugs Plaintiffs and Class Members are

---

[62] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 7, 2025).

[63] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

prescribed, the means by which they pay for these prescriptions, their specific medical conditions, and their patient statuses—is undoubtedly IIHI.

142. Under HIPAA, IIHI is any information that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. Plaintiffs' and Class Members' Sensitive Health Information, which includes both their specific medical conditions and specific prescription drugs taken to treat those medical conditions, is squarely within the ambit of this definition.

143. Moreover, the Department of Health and Human Services ("HHS") has explicitly advised that "a pharmaceutical manufacturer that provides support and guidance to doctors and patients regarding the proper use of their products is providing 'health care'" under the meaning of HIPAA and is thus a covered entity.[64]

144. Defendants provided health care to Plaintiffs and Class Members in connection with the Pharmaceutical Websites. For example, through the Pharmaceutical Websites, Defendants:

a. Provided Plaintiffs and Class Members with detailed information on how to properly administer and calculate the dosages of Plaintiffs' and Class Members prescription drugs;

[64] *Response to Comments Received – General Provisions: Definitions - Covered Entity*, 65 FR 82569 (2000).

b. Granted Plaintiffs and Class Members with accounts to access personalized "***Patient*** Portals" that host extensive medical information and individualized prescription trackers;

c. Made Registered Nurses ("R.N.s") available to Plaintiffs and Class Members as "Nurse Guides" to serve as resources for Plaintiffs' and Class Members with regards to their prescriptions;

d. Repeatedly and ubiquitously referred to Plaintiffs and Class Members as their "patients"; and

e. Collected and stored medical information from Plaintiffs and Class Members, including the drugs that Plaintiffs' and Class Members' are prescribed, the type of health insurance that Plaintiffs' and Class Members' hold, and the medical conditions that Plaintiffs' and Class Members' have been diagnosed with, and additionally required Plaintiffs and Class Members to affirm that this information was accurate and identical to information provided to their treating physicians and health insurance providers.

**iii. Defendants' Use of the Tracking Tools Violates HIPAA**

145. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

146. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendants are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent.

147. Lest there be any doubt of the illegal nature of Defendants' practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA* Covered *Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

148. Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI***

***to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[65]

149. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[66]

150. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

151. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

152. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the

---

[65] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS, *available online at*: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[66] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

information." C.F.R. § 160.514.

153. The HIPAA Privacy Rule requires any "covered entity" to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

154. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[67]

155. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[68]

156. Here, Defendants provided patient information to third parties in violation of the

---

[67] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 7, 2025).

[68] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 7, 2025).

Privacy Rule.

157. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

158. Defendants further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that

would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

## E. DEFENDANTS' USE OF THE TRACKING TOOLS VIOLATES THE NEW JERSEY DATA PRIVACY LAW

159. In addition to HIPAA, Defendants also violated the New Jersey Data Privacy Law (NJDPL).

160. Effective January 15, 2025, the NJDPL is a comprehensive data privacy statute that regulates some of the data collected by Defendants through the Pharmaceutical Websites.

161. Under the NJDPL, website operators like Defendants are required to:

a. limit the collection of personal data to what is adequate, relevant, and reasonably necessary in relation to the purposes for which such data is processed, as disclosed to the consumer;

b. not process personal data for purposes that are neither reasonably necessary to, nor compatible with, the purposes for which such personal data is processed, as disclosed to the consumer, unless the controller obtains the consumer's consent;[…]

c. not process sensitive data concerning a consumer without first obtaining the consumer's consent, or, in the case of the processing of personal data concerning a known child, without processing such data in accordance with COPPA;

d. […and] specify the express purposes for which personal data are processed.

N.J. Stat. § 56:8-166.12.

162. Additionally, under the New Jersey law, entities like Defendants are to "not conduct processing that presents a heightened risk of harm to a consumer without conducting and documenting a data protection assessment of each of its processing activities that involve personal data acquired [after January 15, 2025] that present a heightened risk of harm to a consumer." N.J. Stat. § 56:8-166.12(a)(9). Under these statutes, a "heightened risk" includes:

(1) processing personal data for purposes of targeted advertising or for profiling if the profiling presents a reasonably foreseeable risk of: unfair

> or deceptive treatment of, or unlawful disparate impact on, consumers; financial or physical injury to consumers; a physical or other intrusion upon the solitude or seclusion, or the private affairs or concerns, of consumers if the intrusion would be offensive to a reasonable person; or other substantial injury to consumers;
>
> (2) selling personal data; and
>
> (3) processing sensitive data.

N.J. Stat. § 56:8-166.12.

163. Moreover, under this statute, consent means:

> [A] clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to allow the processing of personal data relating to the consumer.
>
> "Consent" may include a written statement, including by electronic means, or any other unambiguous affirmative action. Consent shall not include: acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information; hovering over, muting, pausing, or closing a given piece of content; or agreement obtained through the use of dark patterns.

N.J. Stat. § 56:8-166.4.

164. Defendants' use of the Tracking Tools described in this Complaint violated these state data privacy protection statutes.

## F. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

165. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendants, they each had a reasonable expectation that the information would remain confidential and that Defendants would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with medical care.

166. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

167. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[69]

168. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[70] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[71]

169. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

## V. TOLLING AND ESTOPPEL

170. Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the incorporation of the Tracking Tools onto the Pharmaceutical Websites.

171. The Tracking Tools on the Pharmaceutical Websites were and are invisible to the average website visitor.

172. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

---

[69] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

[70] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[71] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

173. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

174. Defendants had exclusive knowledge that the Pharmaceutical Websites incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiffs and Class Members, that by scheduling appointments through the Pharmaceutical Websites, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including the Tracking Tool Providers.

175. Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of their patients' Sensitive Health Information. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

176. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

177. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

## VI. CLASS ALLEGATIONS

178. This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

179. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All natural persons who used a Pharmaceutical Website to apply for a Savings Card, create a Patient Portal account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

180. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses, which are defined as follows:

**New Jersey Subclass**

All natural persons residing in the State of New Jersey who used a Pharmaceutical Website to apply for a Savings Card, create a Patient Portal account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

**Michigan Subclass**

All natural persons residing in the State of Michigan who used a Pharmaceutical Website to apply for a Savings Card, create a Patient Portal account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

**Illinois Subclass**

All natural persons residing in the State of Illinois who used a Pharmaceutical Website to apply for a Savings Card, create a Patient Portal account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

**Indiana Subclass**

All natural persons residing in the State of Indiana who used a Pharmaceutical Website to apply for a Savings Card, create a Patient Portal account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

**<u>Arkansas Subclass</u>**

> All natural persons residing in the State of Arkansas who used a Pharmaceutical Website to apply for a Savings Card, create a Patient Portal account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

181. Excluded from the proposed Class (including all subclasses) are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

182. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

183. **<u>Numerosity.</u>** The Class is so numerous that the individual joinder of all members is impracticable. On information and belief, there are at least 100,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

184. **<u>Commonality.</u>** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a. Whether and to what extent Defendants had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

b. Whether Defendants had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

d. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Health Information was being disclosed without their consent;

e. Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g. Whether Defendants violated the statutes asserted as claims in this Complaint;

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

i. Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Sensitive Health Information.

185. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Tools. Each Plaintiff is typical of, and represents, a subclass of Website users residing in their respective home states whose Sensitive Health Information was compromised as a result of Defendants' incorporation and use of the Tracking Tools.

186. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be

antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

187. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the Tracking Tool Providers, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

188. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

189. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

190. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

191. Finally, all members of the proposed Class are readily ascertainable. Defendants and the Tracking Tool Providers have access to Class Members' names and other identifying information provided to Defendants through the Pharmaceutical Websites.

**COUNT I**
**COMMON LAW INVASION OF PRIVACY**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses)***

192. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

193. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

194. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendants via the Pharmaceutical Websites and the communications platforms and services therein.

195. Plaintiffs and Class Members communicated Sensitive Health Information that they intended for only Defendants to receive and that they understood Defendants would keep private and secure.

196. Defendants' interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

197. Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

198. Defendants' disclosure and publicization of Plaintiffs' and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

199. As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

200. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

201. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

202. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

203. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT II
## BREACH OF CONFIDENCE
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses)***

204. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 203 as if fully set forth herein.

205. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

206. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendants, including communications exchanged on the Pharmaceutical Websites.

207. Contrary to its duties as medical providers and its express promises of confidentiality, Defendants deployed the Tracking Technologies to disclose and transmit Plaintiffs' and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendants to third parties, including the Tracking Tool

Providers.

208. Defendants' disclosures of Plaintiffs' and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

209. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

210. As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendants' breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

e. Defendants' actions diminished the value of Plaintiffs' and Class Members' Sensitive Health Information, and

f. Defendants' actions violated the property rights Plaintiffs and Class Members have in their Sensitive Health Information.

211. Plaintiffs and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiffs are also entitled to punitive damages.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the New Jersey, Michigan,***

***Illinois, Indiana, and Arkansas Subclasses)***

212. Plaintiffs repeat the allegations contained in paragraphs 1 through 211 as if fully set forth herein.

213. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential, which creates a special relationship between Defendants and Plaintiffs.

214. In light of the special relationship between Defendants and Plaintiffs and Class Members, whereby Defendants became guardians of Plaintiffs' and Class Members' Sensitive Health Information, Defendants became fiduciaries by their undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Sensitive Health Information; (2) to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

215. Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with their patients and former patients, in particular, to keep secure their Sensitive Health Information private.

216. Defendants breached their fiduciary duties to Plaintiffs and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiffs and Class Members of this fact.

217. As a direct and proximate result of Defendants' breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT IV
## NEGLIGENCE
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses)***

218. Plaintiffs repeat and reallege the allegations contained in in paragraphs 1 through 217 as if fully set forth herein.

219. Through their use of the Pharmaceutical Websites, Plaintiffs and Class Members provided Defendants with their Sensitive Health Information, believing such Information would be kept confidential.

220. By collecting and storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

221. Defendants negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to the Tracking Tool Providers.

222. Defendants further negligently omitted to inform Plaintiffs and the Class that they would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

223. Defendants knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Health Information to Defendants had they known that Defendants intended to use that Information for unlawful purposes.

224. Defendants' conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

225. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

226. Defendants' negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses)***

227. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 226 as if fully set forth herein.

228. When Plaintiffs and Class Members provided their Sensitive Health Information to Defendants in exchange for medical services, they entered into an implied contract pursuant to which Defendants agreed to safeguard and not disclose the Sensitive Health Information without consent.

229. Plaintiffs and Class Members accepted Defendants' offers and provided their Sensitive Health Information to Defendants.

230. Plaintiffs and Class Members would not have entrusted Defendants with their Sensitive Health Information in the absence of an implied contract between them and Defendants obligating Defendants to not disclose Sensitive Health Information without consent.

231. Defendants breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Health Information to third parties like the Tracking Tool Providers.

232. As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

233. Plaintiffs and Class Members would not have used Defendants' services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

234. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendants' breaches of implied contract.

**COUNT VI**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses)***

235. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 234 as if fully set forth herein.

236. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

237. Plaintiffs and Class Members conferred a monetary benefit on Defendants in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendants which Defendants then utilized for marketing and advertising purposes, as described, *supra*.

238. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from the Sensitive Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

239. In particular, Defendants enriched themselves by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

240. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate

result of Defendants' decision to prioritize its own profits over the privacy of its patients' Sensitive Health Information.

241. Under the principles of equity and good conscience, Defendants should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiffs' and Class Members' Sensitive Health Information.

242. If Plaintiffs and Class Members knew that Defendants had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendants.

243. Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of direct money damages.

244. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

245. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

## COUNT VII
## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*
## Unauthorized Interception, Use, and Disclosure
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses)***

246. Plaintiffs repeat and reallege the allegations contained in the paragraphs 1 through 245 as if fully set forth herein.

247. The ECPA protects both sending and receipt of communications.

248. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

249. The transmissions of Plaintiffs' Sensitive Health Information to the Pharmaceutical Websites qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

250. Electronic Communications. The transmission of Sensitive Health Information between Plaintiffs and Class Members and the Pharmaceutical Websites with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

251. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

252. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

253. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendants' web-servers; and

d. The Pixel code deployed by Defendants to effectuate the sending and acquisition of patient communications.

254. By utilizing and embedding the Pixels on the Pharmaceutical Websites, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

255. Specifically, Defendants intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as the Tracking Tool Providers.

256. Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information, including their prescription statuses and medical conditions.

257. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

258. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

259. <u>Unauthorized Purpose</u>. Defendants intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

260. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

261. Defendants are not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendants are a party, Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information does not qualify for the party exemption.

262. Defendants' acquisition of sensitive communications that were used and disclosed to the Tracking Tool Providers was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;
b. Breach of confidence;
c. Breach of fiduciary duty;
d. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and
e. Violations of the New Jersey Data Protection Law, N.J. Stat. § § 56:8-166.4, *et seq*.;
f. Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1, *et seq.*; and
g. violations of the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*

263. Defendants are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on the Pharmaceutical Websites, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with

the Tracking Tool Providers and other third-parties that (a) did not participate in these communications, (b) Plaintiffs and Class Members did not know were receiving their Sensitive Health Information, and (c) Plaintiffs and Class Members did not consent to receive their Sensitive Health Information.

264. As such, Defendants cannot viably claim any exception to ECPA liability.

265. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendants' invasion of privacy in that:

a. Learning that Defendants have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b. Defendants received substantial financial benefits from its use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendants received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how people use the Pharmaceutical Websites and determining what ads people see on the Pharmaceutical Websites, without providing any value or benefit to Plaintiffs or Class Members;

d. Defendants failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendants making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

266. Defendants intentionally used the wire or electronic communications to increase its profit margins. Defendants specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' Sensitive Health Information for financial gain.

267. Defendants were not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

268. Plaintiffs and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading their privacy via the Pixels.

269. Any purported consent that Defendants may claim to have received from Plaintiffs and Class Members was not valid.

270. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to their use of the Pharmaceutical Websites, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

271. As a result of Defendants' violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VIII**
**VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. 56:8-1, *et seq.***
***(On Behalf of Plaintiffs L.S. and T.W., and the New Jersey Subclass)***

272. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 271 as if fully set forth herein.

273. Every one of the Defendants is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

274. Defendants sell and advertise "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

275. N.J. Stat. Ann. 56:8-2 prohibits:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]

276. Defendants violated the New Jersey Consumer Fraud Act by to inform Plaintiffs L.S. and T.W., and New Jersey Subclass Members that they would disclose Plaintiffs L.S. and T.W., and New Jersey Subclass Members' Sensitive Health Information to unauthorized third parties, as detailed above.

277. Defendants intended to mislead Plaintiffs L.S. and T.W., and New Jersey Subclass Members and intended to induce Plaintiffs L.S. and T.W., and New Jersey Subclass Members to rely on their misrepresentations and omissions.

278. Plaintiffs L.S. and T.W., and New Jersey Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs

**COUNT VIII**
**VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT ("IDCSA")**
**Ind. Code Ann. § 24-5-0.5-1, *et seq.***
***(On Behalf of Plaintiff M.W. and the Indiana Subclass)***

279. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 278 as if fully set forth herein.

280. The IDCSA prohibits a "supplier" from "commit[ting] an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction…whether it occurs before, during, or after the transaction[,] includ[ing] both implicit and explicit misrepresentations." Ind. Code Ann. § 24-5-0.5-3.

281. Every one of the Defendants is a "supplier" under Ind. Code Ann. § 24-5-0.5-2(a)(2).

282. Defendants' advertisements and services made through the Pharmaceutical Websites are "consumer transactions" under Ind. Code Ann. § 24-5-0.5-2(a)(1).

283. Defendants' knowing, intentional violations of the IDCSA include:

a. Failing to inform Plaintiff M.W. and Indiana Subclass Members that it would provide their Sensitive Information to third parties in exchange for advertising and marketing services; and

b. Surreptitiously collecting and sharing Plaintiff M.W. and Indiana Subclass Members' Sensitive Information with third parties.

284. As a result of Defendant's violations of the IDCSA, Plaintiff M.W. and Indiana Subclass Members are entitled to all damages available under Ind. Code Ann. § 24-5-0.5-4, including actual damages, statutory damages of up to $1,000 per violation, equitable or declaratory relief, punitive damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendants as follows:

A. an Order certifying the Nationwide Class, and New Jersey, Michigan, Illinois, Indiana, and Arkansas Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages,

as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

Dated: November 26, 2025

Respectfully submitted,

*/s/ Jack R. Spitz*
Jack R. Spitz, SBN 248632019
Siri | Glimstad LLP
8 Campus Drive, Suite 105 PMB#161
Parsippany, New Jersey 07054
Main: 212-532-1091
jspitz@sirillp.com

Tyler J. Bean*
Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

**pro hac vice admission anticipated*

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: November 26, 2025

Respectfully submitted,

*/s/ Jack R. Spitz*
Jack R. Spitz, SBN 248632019
Siri | Glimstad LLP
8 Campus Drive, Suite 105 PMB#161
Parsippany, New Jersey 07054
Main: 212-532-1091
jspitz@sirillp.com